FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

May 21, 2019

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

CARL ANDERSON, an individual; MARSHALL ANDERSON, an individual; ELMER C. ANDERSON, INC., a Washington Corporation; JEFF WIERSMA, an individual; J2 CATTLE CO., a Washington Corporation; S. MARTINEZ LIVESTOCK, INC., a Washington Corporation; and NICK MARTINEZ, an individual,

Plaintiffs,

v.

UNITED STATES OF AMERICA,

Defendant.

No. 1:18-cv-003011-SAB

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS**

Before the Court is the Government's Rule 12(b)(1) Motion to Dismiss Under FTCA's Discretionary Function Exception, ECF No. 39. The Government argues Plaintiffs' claims are barred by federal sovereign immunity. The Court held a hearing on this matter on May 9, 2019, in Spokane, Washington. Michael Helgren, Matthew Campos, and Gregory Lighty appeared on behalf of Plaintiffs,

and Tim Durkin and Joseph Derrig appeared on behalf of the Government. The Court took the matter under advisement.

After careful consideration of the parties' briefing and oral presentation, the Court finds Plaintiffs' claims fall within the Discretionary Function Exception (DFE) to the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2680(a). Thus, the Government's motion to dismiss is granted and Plaintiffs' action is dismissed for lack of subject matter jurisdiction.

## BACKGROUND

This case stems from the fire that occurred on July 30, 2016 at the Yakima Training Center's Range 12 (the "Range 12 Fire"). The fire started when a United States Army soldier fired a machine gun at a target using tracer rounds. One of the tracer rounds ricocheted from the target area and landed on some brush, which started a brush fire. The fire spread beyond the YTC and onto Plaintiffs' rangeland properties, causing property damage to Plaintiffs' cattle businesses.

### 1. The Approved Live Fire Training and Request for Tracer Ammunition.

In late July 2016, the Company B, 5th Battalion, 20th Infantry (the "Army training unit"),[1] under the direction of its commanding officers and with pre-approval and authorization from the Yakima Training Center (YTC) Base Commander, Lt. Col. Jarett Mathews, was scheduled to perform live fire exercises at the Range 12 firing zone at the YTC. Statement of Jurisdictional Facts, ECF No. 38 ("SJF") at ¶ 27. The Army training unit planned, coordinated, and submitted for approval to the YTC Range Operations a Concept of Training Operations (CONOP) for live fire exercises (LFX) and training from July 28-30, 2016. SJF ¶ 28. The CONOP was submitted in compliance with the YTC's Training Unit

---

[1] The Company B, 5th Battalion, 20th Infantry Regiment is an active duty light infantry, fire support unit that is part of the 1st Stryker Brigade Combat Team.

Standard Operating Procedures (SOP) for training exercises at the YTC on Range 12. *Id*.

The live fire training proposal "consisted of team and squad – rifle squads and weapons squads – level maneuver LFXs," and incorporated "both small arms (M4) and crew served weapons." SJF ¶ 39. "Ammunition requirements included, but were not limited to, 5.56MM ball (A059), 5.56MM 4x1 link (A064), and 7.62MM 4x1 link (A131)." SJF ¶ 40. "All targets/target arrays were well within prescribed firing boxes and surface danger zones." *Id*.

The Army training unit initially submitted a request for 5.56 MM 4x1[2] ammunition and 7.62MM 4x1 ammunition for the month of July 2016, to support LFX training on Range 12. SJF ¶ 41. The Army training unit later submitted a request for 5.56 MM and 7.62 ball link ammunition, without tracers, in lieu of the previously requested 4x1 ammunition. *Id*. They were unable to obtain ball link ammunition and, instead, commenced LFX training with the previously approved 4x1 tracer ammunition. SJF ¶ 42.

**2. Requirements Prior to Unit Training at the YTC: Brushfire Training, Risk Assessment, Live Fire Risk Matrix.**

Given the YTC's shrub brush terrain, high desert climate, and the military training that takes place there, the YTC is susceptible to experiencing hundreds of fires each year. SJF ¶ 44. For that reason, the Wildland Firefighting Requirements for the YTC require all units training at the YTC to provide wildland fire suppression teams within their units, and they are designated to assist the unit and/or the YTC Fire Department in containing/suppressing wildland fires started while training at the YTC. SJF ¶ 46. The Wildland Fire Plan and the YTC's SOP requires each training unit to receive instruction and training on brushfire

---

[2] "4x1" refers to ammunition loaded such that every fifth round is a "tracer," or a pyrotechnic fluorescent round.

mitigation and suppression. SJF ¶ 50. YTC Fire Department personnel and command staff confirmed that brush fire training was provided to the Army training unit. *Id*.

In addition to fire awareness and brushfire suppression, each training unit is required, before being allowed to train, to perform a Risk Assessment of their proposed training activities. SJF ¶ 51. The Army training unit's Commander, Captain Jeffrey Courchaine, completed a Risk Assessment on July 25, 2016, and submitted it to YTC Range Operations. *Id*. Range fires were identified as having a low initial risk, and with mitigation, had a low residual risk level. *Id*.

The YTC's SOP also requires "YTC Range Operations and training unit to complete a Live Fire Risk Matrix or Fire Matrix before allowing any range or training area to go 'hot' during the wildland fire season." SJF ¶ 52. The Live Fire Risk Matrix "uses a fire weather adjective rating, along with wind reading, that produces a numerical point value. The numeric point value determines the decision approval authority to approve or authorize training during the wildland fire season. The point value ranges from authorization by the Range Desk Officer and Range Officer, up to approval required by the YTC Garrison Commander. When the LFX rating becomes too high, some high risk activities such as the use of pyrotechnics and tracers may be suspended." *Id*.

**3. TYC Garrison Commander, Lt. Col. Mathews, Suspends Live Fire Training on July 29, 2016.**

On July 29, 2016, multiple fires were started across the YTC – including Range 12 – as a result of the Army training unit's live fire training. SJF ¶ 55. The YTC's Senior Range Officer (SRO), George Holman, contacted Lt. Col. Mathews, the YTC Garrison Commander, and it was decided to suspend training for all units in the afternoon of July 29 until the following morning. *Id*. The decision to suspend any further live fire training was based on the frequency and severity of the fires that day, the increased fire risk that afternoon, and the need for YTC

firefighting assets to replenish resources that were expended during the day fighting fires. *Id*.

**4. Lt. Col. Mathews Approved Live Fire Training on July 30, 2016.**

The next day, the National Weather Service issued a Red Flag Warning[3] alerting the public that extreme fire conditions were likely to occur on the afternoon of July 30, 2016. SJF ¶ 59. Due to the increased risk of fire danger, SRO Holman went to the YTC on what is ordinarily his day off. SJF ¶ 61. The initial Live Fire Matrix rating that morning was 6. *Id*. At approximately 2:00 p.m., the numeric value was 10. SJF ¶ 64. While neither of the calculated Live Fire Matrix ratings rose to the level requiring Lt. Col. Mathews's approval authority, he assumed and retained responsibility for approval of live fire training. SJF ¶ 63.

After consultation with YTC officials, Lt. Col. Mathews decided to allow training to occur on the morning of July 30. SJF ¶ 62. In deciding to approve the LFX that day, Lt. Col. Mathews considered: (i) the Live Fire Risk Matrix rating; (ii) condition on the ground at Range 12; (iii) available firefighting assets and location; (iv) locations of previous burns (including prior burn of Range 12 shrub fuel); (v) amount of fuel available for new fire; and (vi) the recommendations of senior YTC staff. *Id*. As part of Lt. Col. Mathews's decision to authorize training,

---

[3] The term Red Flag Warning is used by the fire-weather forecasters to call attention to agencies and the public of certain dry weather conditions that may result in an increased risk of fire danger. The National Weather Service issues a Red Flag Warning to warn geographical areas that critical fire weather conditions are either occurring or will occur shortly. These conditions typically are a combination of strong winds, warm temperatures and low humidity, which contribute to extreme fire conditions and behavior (i.e., sustained 20 ft. winds greater than 15 mph, relative humidity less than 25%, and 10 hr. dead fuel moisture less than 9%). SJF ¶ 57.

he also took steps to mitigate the fire risk by pre-positioning two YTC Fire Department brush fire trucks at Range 12 to augment the slip-on units already positioned at Range 12. *Id*.

Lt. Col. Mathews recalls instructing SRO Holman, on the morning of July 30, 2016, that live fire training on Range 12 should cease should the Army training unit experience any fires while training, or should the wind at Range 12 exceed 10 mph. Decl. of Lt. Col. Jarett Mathews, ¶ 34. Lt. Col. Mathews believes SRO Holman misunderstood his discussion on these points and "did not understand them to be an affirmative range restriction on [the Army training unit's] live fire training on July 30, 2016." *Id*., at ¶ 35.

SRO Holman recalls his discussion with Lt. Col. Mathews a bit differently. SRO Holman recalls discussing the need to be aware of wind speeds and the prompt suppression of fires but does not recall hearing any additional restrictions on the Army training unit's live fire exercises that day. Decl. of George Holman, ¶ 48. SRO Holman did not hear and did not record that live fire exercise training should stop if Range 12 experienced winds speeds greater than 10 mph, or that training should stop if Range 12 experienced any fires while training that morning. *Id*., ¶ 49-50. Since SRO Holman did not hear or understand his discussion with Lt. Col. Mathews as a verbal order, he did not inform the Army training unit of the additional training restrictions. SJF ¶ 69.

The Army training unit continued to engage in live fire training exercises through the afternoon on July 30, 2016.  At approximately 4:40 p.m., one of the Army training unit's soldier's fired a machine gun at a target using tracer rounds. SJF ¶ 74. One of the tracer rounds ricocheted from the target area and landed on some brush, which started a brush fire. *Id*. The fire spread beyond the YTC and onto Plaintiffs' rangeland properties, causing property damage to Plaintiffs' cattle businesses.

//

**5. Army Regulation 15-6 Administrative Investigation into the Range 12 Fire.**

On August 5, 2016, Col. Robert Kuth was appointed to conduct an Army Regulation 15-6 Administrative Investigation into the Range 12 Fire at the YTC. ECF No. 33-1. The purpose of the investigation "was to conduct a thorough analysis of the facts and circumstances leading up to and causing the fire, the efforts to remediate the fire, and the damage caused by the fire." *Id*., at 11. After a thorough investigation, Col. Kuth concluded that the Army training unit's live fire training on July 30, 2016, "was properly planned, coordinated, and executed in accordance with prescribed range regulations and standard operating procedures. YTC approved all unit training in accordance with existing regulations and policies." *Id*., at 12.

## PROCEDURAL HISTORY

On January 25, 2018, Plaintiffs filed a Complaint against the United States of America, the United States Department of Defense, and the United States Army, for damages resulting from the Range 12 Fire at the YTC. ECF No. 1. Plaintiffs bring this action under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671 *et seq*. Following the initial scheduling conference, the Court issued an Order limiting the scope discovery to the issue of subject matter jurisdiction. ECF No. 15.

On June 26, 2018, Plaintiffs filed a First Amended Complaint (FAC). ECF No. 21. The FAC was necessary to correct two deficiencies[4] in Plaintiffs' original complaint. The FAC brought six causes of action against the United States: (1)

---

[4] First, the FAC was necessary to dismiss two named federal agencies that were improperly named as defendants (Department of Defense and U.S. Army). Second, the FAC removed two causes of action that were improperly alleged (Inverse Condemnation and Strict Liability).

Negligence and/or Recklessness; (2) Res Ipsa Loquitur; (3) Negligent Training and Supervision; (4) Trespass; (5) Nuisance; and (6) Violation of Wash. Rev. Code § 76.04.730.

On March 26, 2019, the Court granted Plaintiffs leave to file a Second Amended Complaint (SAC). ECF No. 98. Plaintiffs' SAC adds Nick Martinez and S. Martinez Livestock, Inc., as plaintiffs to this action and amends Plaintiffs' factual allegations. ECF No. 99.

## STANDARD

### Subject Matter Jurisdiction

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Under Federal Rule of Civil Procedure 12(b)(1) and (h)(3), a district court must dismiss an action where it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1), (h)(3).

An attack on subject matter jurisdiction may be either facial or factual. *Edison v. United States*, 822 F.3d 510, 517 (9th Cir. 2016). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

In this case, the Government mounted a factual attack when it filed declarations and affidavits challenging Plaintiffs' allegations. *See Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004) (stating that party bringing a factual challenge to subject matter jurisdiction must do so by "presenting affidavits or other evidence properly brought before the court." (quoting *Safe Air*, 373 F.3d at 1039)).

In response to a factual attack, a plaintiff "must present 'affidavits or any other evidence necessary to satisfy [their] burden of establishing that the court, in

fact, possesses subject matter jurisdiction." *Edison*, 822 F.3d at 517 (quoting *Colwell v. Dep't of Health & Human Servs.*, 558 F.3d 1112, 1121 (9th Cir. 2009) (citation omitted). Thus, in resolving a factual attack, the Court may look beyond the complaint to the parties' evidence without converting the motion to dismiss into a motion for summary judgment. *Edison*, 822 F.3d at 517. In evaluating the evidence, the Court need not presume the truthfulness of the Plaintiffs' allegations but must resolve any factual disputes in Plaintiffs' favor. *Id*.

However, the Court must treat the motion to dismiss as a motion for summary judgment if " 'the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits' of an action." *Sun Valley Gasoline, Inc. v. Ernst Enterprises, Inc.*, 711 F.2d 138, 139 (9th Cir. 1983) (quoting *Augustine v. U.S.*, 704 F.2d 1074, 1077 (9th Cir. 1983)). Normally, the issue of jurisdiction and the merits of an action are intertwined where "a statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiff's substantive claim for relief." *Safe Air*, 373 F.3d at 1039 (citing *Sun Valley*, 711 F.2d at 139).

**Sovereign Immunity**

"Absent a waiver of sovereign immunity, courts have no subject matter jurisdiction over cases against the [federal] government." *Munns v. Kerry*, 782 F.3d 402, 412 (9th Cir. 2015) (citing *Kaiser v. Blue Cross of Cal.*, 347 F.3d 1107, 1117 (9th Cir. 2003)). "[A]ny waiver 'must be unequivocally expressed in statutory text … and will not be implied.' " *Ordonez v. United States*, 680 F.3d 1135, 1138 (9th Cir. 2012) (omission in original) (quoting *Lane v. Pena*, 518 U.S. 187, 192 (1996)). "Once challenged, the party asserting subject matter jurisdiction has the burden of proving its existence." *Robinson v. United States*, 586 F.3d 683, 685 (9th Cir. 2009) (citing *Rattlesnake Coal. v. E.P.A.*, 509 F.3d 1095, 1102 n.2 (9th Cir. 2007)).

//

## DISCUSSION

### I. Motion to Dismiss Under FTCA's Discretionary Function Exception.

The Government argues the Court lacks subject matter jurisdiction because Plaintiffs' claims fall within the Discretionary Function Exception to the FTCA.

#### (1) Discretionary Function Exception to the Federal Tort Claims Act.

The FTCA provides a limited waiver of the sovereign immunity of the United States for torts committed by federal employees acting within the scope of their employment. 28 U.S.C. § 1346(b)(1); *Gonzalez v. U.S.*, 814 F.3d 1022, 1026-27 (9th Cir. 2016). The FTCA's waiver of immunity is limited by a number of statutory exceptions. *See* 28 U.S.C. § 2680. This case deals with the Discretionary Function Exception. 28 U.S.C. § 2680(a).

The DFE provides that the FTCA shall not apply to:

> Any claim … based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. 2680(a). This DFE is designed to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *U.S. v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984). Where the DFE applies, the United States has not waived its sovereign immunity and the Court lacks subject matter jurisdiction over Plaintiffs' claims. *Gonzalez*, 814 F.3d at 1027 (citing *GATX/Airlog Co. v. U.S.*, 286 F.3d 1168, 1173 (9th Cir. 2002)).

The Government bears the burden of demonstrating the DFE applies. *Gonzalez*, 814 F.3d at 1027.

To determine whether the DFE applies, the courts engage in a two-step inquiry. *Berkovitz v. U.S.*, 486 U.S. 531, 536-37 (1988). First, the Court must determine whether the challenged conduct involves an element of judgment or

choice. *Id*. The exception will not apply if a " 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive.' " *U.S. v. Gaubert*, 499 U.S. 315, 322 (9th Cir. 1991) (quoting *Berkovitz*, 486 U.S. at 536).

If the conduct involves some element of judgment or choice, the court must then determine whether the conduct implements social, economic, or political policy considerations. *Berkovitz*, 486 U.S. at 537. "When a statute or regulation allows a federal agent to act with discretion, there is a 'strong presumption' that the authorized act is based on an underlying policy decision." *Nurse v. U.S.*, 226 F.3d 996, 1001 (9th Cir. 2000) (quoting *Gaubert*, 499 U.S. at 324).

**(A) Step 1: Whether the Challenged Conduct Involves an Element of Judgment or Choice?**

The first step of the DFE inquiry requires the Court to determine whether the challenged conduct involves an element of judgement or choice. *Gaubert*, 499 U.S. at 322. In this case, Plaintiffs challenge the Government's conduct that resulted in the Range 12 Fire. More specifically, Plaintiffs claim the Government was negligent in (i) permitting live fire training exercises on the day of the Range 12 Fire; (ii) failing to adhere to Lt. Col. Mathews's oral orders imposing additional training restriction on the day of the Range 12 Fire; (iii) failing to take reasonable precautions to prevent a fire from igniting on at the YTC; (iv) failing to provide adequate information, supervision, and/or training its personnel, employees, and/or agents who were carrying out training exercises on the day of the Range 12 Fire; and (v) failing to take proper precautions to ensure that any fires started at the YTC would be quickly contained. Second Amended Complaint at 5-9.

Yet "negligence is simply irrelevant to the discretionary function inquiry." *Kennewick Irr. Dist. v. U.S.*, 880 F.2d 1018, 1029 (9th Cir. 1989); 28 U.S.C. § 2680(a) (the discretionary function exception excludes "[a]ny claim …based upon the exercise or performance or the failure to exercise or perform a discretionary

function or duty on the part of a federal agency or an employee of the Government, *whether or not the discretion involved be abused*") (emphasis added). The inquiry is whether the decision was one of judgment or choice, not whether that choice was proper.

The Government argues that there is no specific, mandatory, non-discretionary directive that was violated by any Army personnel on the day of the Range 12 Fire, and thus, that the decision was an exercise of judgment. The Government asserts Lt. Col. Mathews and SRO Holman had discretion regarding the manner and method of wildfire prevention, and whether to allow the Army training unit to engage in live fire training exercises on July 30, 2016.

The Court finds the conduct being challenged in this case involved elements of judgment and choice. The applicable statutes, regulations, and policies granted Lt. Col. Mathews the discretion to authorize the Army training unit to engage in live fire training exercises with tracer ammunition on July 30, 2016. Additionally, the Court finds the Government actors did not violate any specific, mandatory, non-discretionary directives related to fire prevention and suppression.

The Court is not convinced that Lt. Col. Mathews's alleged oral orders in this case constitute mandatory directives sufficient to defeat the DFE. The DFE does not apply if "a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because the 'employee has no rightful option but to adhere to the directive.' " *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz*, 486 U.S. at 536). The Court finds several problems with Plaintiffs' contention that Lt. Col. Mathews's alleged oral order in this case are sufficient to defeat the DFE.

First, the alleged mandatory directive is not a federal statute, regulation, or policy; it is an oral order. Plaintiffs fail to cite any binding authority that supports finding Lt. Col. Mathews's oral orders constitute mandatory, non-discretionary directives for purposes of determining whether the DFE applies. Moreover, the

Court finds Plaintiffs' reliance on *Parrot v. U.S.*, 536 F.3d 629 (7th Cir. 2008) and *Keller v. U.S.*, 771 F.3d 1021 (7th Cir. 2014), is misplaced. *Parrot* involved a FTCA claim against the United States when the plaintiff, an incarcerated individual, was stabbed 22 times by his former cellmate. 536 F.3d at 630. At issue was whether a federal Bureau of Prisons regulation mandated prison officials to keep the plaintiff and his attacker separated. *Id*. at 631. The regulation prohibited inmates with a "Separation"[5] designation from being confined in the same institution "unless the institution has the ability to prevent any physical contact between the inmates concerned." *Id*. (citing 28 C.F.R. § 524.72(f)).

The facts showed that the plaintiff had a "Separation" designation at the time that he was attacked. *Id*. at 631. However, due to heavy redactions on the document in question, it was unclear whether the designation required the plaintiff to be separated from the individual who attacked him. *Id*. Thus, the issue in *Parrot* was quite simple: if the plaintiff could show that his "Separation" designation required him to be kept apart from his attacker, then 28 U.S.C. § 524.72(f) mandated Bureau of Prisons officials to engage in a specific course of action. 536 F.3d at 638. In other words, if the plaintiff could show that the federal regulation was triggered and required specific, mandatory conduct, then the DFE would not apply. *Id*. The Seventh Circuit Court of Appeals remanded the case back to the district court to investigate whether the plaintiff's "Separation" designation required him to remain separated from his attacker. *Id*. at 638-39.

As was the case in *Parrot*, *Keller* also involved a FTCA claim against the United States by a federal prisoner who was assaulted by another inmate. 771 F.3d

---

[5] It appears that the Bureau of Prisons classifies its inmates using different Central Inmate Monitoring System categories.536 F.3d at 631. A "Separation" classification alerts Bureau of Prisons officials that one inmate should be separated from another inmate. *Id*.

at 1022. The plaintiff alleged Bureau of Prisons officials were negligent and the DFE did not apply because the challenged conduct violated mandatory regulations. *Id*. at 1024. The Seventh Circuit Court of Appeals found the record was unclear as to what procedures and regulations applied to the Bureau of Prisons officials' conduct. *Id*. Thus, the Seventh Circuit remanded the case for further development of the record. *Id*. at 1026.

These cases do not support Plaintiffs' proposition that Lt. Col. Mathews's alleged oral orders are sufficient to defeat the DFE. In fact, *Parrot* and *Keller* reinforce thatStep 1 of the DFE inquiry requires the Court to assess the challenged conduct against any applicable statute, regulation, or policy. In this case, the applicable statutes, regulations, and policies all indicate Lt. Col. Mathews had the discretion to authorize the Army training unit to engage in live fire training exercises on July 30, 2016.

Second, the record shows Lt. Col. Mathews's alleged oral orders were ambiguous and uncommunicated. SRO Holman did not hear and did not record that live fire training should stop if Range 12 experienced winds speeds greater than 10 mph, or that training should stop if Range 12 experienced any fires while training that morning. SJF ¶ 49-50. Because SRO Holman did not hear or understand his discussion with Lt. Col. Mathews as a verbal order, he did not inform the Army training unit of the additional training restrictions. SJF ¶ 69.

In sum, the Court finds the conduct being challenged in this case involved elements of judgment and choice. Stated differently, there is no evidence in the record that shows the Government violated any mandatory, non-discretionary directives that governed the conduct at issue. Accordingly, Step 1 of the DFE inquiry weighs heavily in favor of finding Plaintiffs' claims are barred by federal sovereign immunity.

//

//

**(B) Step 2: Whether the Challenged Conduct Implements Social, Economic, or Political Party Considerations?**

Once the Court determines that discretion is involved, the second step of the DFE inquiry requires the Court to determine whether the challenged conduct "is of the kind that the discretionary function was designed to shield." *Berkovitz,* 486 U.S. at 536. The DFE is designed to protect only government actions and decisions grounded in "social, economic, and political policy." *Gaubert*, 499 U.S. at 323. The relevant inquiry is not whether the explicit balancing is proved, but whether the decision is susceptible to policy analysis. *Kennewick*, 880 F.2d at 1028.

"When a statute or regulation allows a federal agent to act with discretion, there is a 'strong presumption' that the authorized act is based on an underlying policy decision." *Nurse*, 226 F.3d at 1001 (quoting *Gaubert*, 499 U.S. at 324).

The Court finds Lt. Col. Mathews's decision to approve the live fire training with tracer ammunition is susceptible to policy analysis. The YTC SOP provides that the primary mission of the YTC is to provide military training and support. ECF No. 38, Ex. 10. "As a training facility, JBLM YTC provides the opportunity, facilities, and support for military units, including both actives and reserve component forces, to enhance troop readiness and train for mobilization exercises." *Id*., at 391. All branches of the armed forces and allied military units train at the YTC in an effort "to sustain and improve unit readiness for both wartime and contingency operations." *Id*.

The YTC SOP acknowledges that wildland fires are a major concern at the YTC. *Id*., at 428. "Dry conditions, low humidity, and strong winds combine to create conditions favorable for large uncontrolled fires. Wildland fires can burn across extensive portions of the installation very rapidly or go off the installation damaging private property." *Id*. The YTC SOP requires that "[f]ire prevention, protection, and suppression procedures must comply with National Fire Protection

Association (NFPA) codes, Occupational Safety and Health Administration (OSHA), the JBLM YTC Wildland Fire Management Plan, and federal and state codes." *Id*. Additionally, JBLM Regulation 220-2 establishes policies, responsibilities, procedures, and requirements for training units to meet wildland firefighting responsibilities at the YTC. ECF No. 38, Ex. 4.

During the wildland fire season (April 15 through September 30), the YTC SOP requires that "Range Operations complete[] a Live Fire Risk Matrix (LFRM) prior to allowing any range or training area to go 'hot,' or any maneuver element to use pyrotechnic devices. When the LFRM rating becomes too high, some high risk activities, including tracer ammunition and smoke generating devices, may be restricted or completely prohibited" at the direction of YTC's Range Operations or the Garrison Commander." *Id*.; ECF No. 33-1 at 13-14.

In light of the concerns about wildland fires on the YTC during wildland fire season, Lt. Col. Mathews maintained the discretion to authorize live fire training on the day of the Range 12 Fire. In deciding to approve the LFX that day, Lt. Col. Mathews considered: (i) the Live Fire Risk Matrix rating; (ii) condition on the ground at Range 12; (iii) available firefighting assets and location; (iv) locations of previous burns (including prior burn of Range 12 shrub fuel); (v) amount of fuel available for new fire; and (vi) the recommendation of senior YTC staff. SJF ¶ 62. As part of Lt. Col. Mathews's decision to authorize training, he also took steps to mitigate the fire risk by prepositioning two YTC Fire Department brush fire trucks at Range 12 to augment the slip-on units the Army training unit already had on Range 12. *Id*.

The applicable regulations make clear that live fire exercise training at the YTC, along with the fire containment/suppression decisions, requires balancing competing policy concerns: the interest in providing a realistic military training environment against the immediate and long-term preservation and safety on and off the YTC range.

Plaintiffs are correct that "[w]here the challenged governmental activity involves safety considerations under an established policy rather than the balancing of competing public policy considerations," the DFE does not apply. *ARA Leisure Servs. v. U.S.*, 831 F.2d 193, 195 (9th Cir. 1987). However, as indicated above, the challenged conduct is susceptible to a balancing of competing interests. As such, it is the type of conduct that the DFE is designed to protect. *See Miller v. U.S.*, 163 F.3d 591, 596 (9th Cir. 1998) (explaining that the critical inquiry is whether the challenged conduct is susceptible to a balance of competing policy concerns).

**CONCLUSION**

The Court finds the Government has satisfied its burden of proving Plaintiffs' claims fall within the Discretionary Function Exception to the Federal Tort Claims Act. As such, Plaintiffs' action is barred by federal sovereign immunity.

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1. The Government's Motion to Dismiss Under FTCA's Discretionary Function Exception, ECF No. 39, is **GRANTED**. Plaintiffs' Second Amended Complaint is **DISMISSED with prejudice**.
2. Judgment shall be entered in favor of Defendant and against Plaintiffs.
3. All pending motions are denied as moot.

**IT IS SO ORDERED**. The District Court Clerk is hereby directed to enter this Order and provide copies to counsel and close the file.

**DATED** this 21st day of May 2019.

Stanley A. Bastian
United States District Judge