FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Jun 10, 2022

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| CARL ANDERSON, an individual; MARSHALL ANDERSON, an individual; ELMER C. ANDERSON, INC., a Washington Corporation; JEFF WIERSMA, an individual; J2 CATTLE CO., a Washington Corporation; S. MARTINEZ LIVESTOCK, INC., a Washington Corporation; and NICK MARTINEZ, an individual,<br><br>　　　　Plaintiffs,<br><br>　　　　v.<br><br>UNITED STATES OF AMERICA,<br><br>　　　　Defendant. | No. 1:18-CV-003011-SAB<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** |

Before the Court is the Defendant United States of America's Rule 12(b)(1) Motion to Dismiss Under FTCA's Discretionary Function Exception, ECF No. 39. The Court held an evidentiary hearing on the motion on March 21 and 22, 2022, in Spokane, Washington. Matthew Campos and Gregory Lighty appeared on behalf of Plaintiffs. Timothy Durkin, Derek Taylor, and John Drake appeared on behalf of

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS *1**

Defendant United States of America (the "Government"). The Court took the matter under advisement.

This case is about a brush fire that ignited during a U.S. Army live fire training exercise on July 30, 2016 at the Yakima Training Center. The fire spread onto Plaintiffs' properties and damaged their cattle business operations. Plaintiffs bring the present action to recover damages under the Federal Tort Claims Act. The Government moved to dismiss the case on the basis that the Court lacks subject matter jurisdiction and Plaintiffs' claims are barred by the doctrine of sovereign immunity.

In this case, the Government's decision to continue live fire training on July 30th did not involve shortchanging or failing to implement specific safety policies that were already adopted. Rather, Government actors on that day used permissible judgment to balance competing policy considerations that were envisioned by U.S. Army guidelines. For that reason, Plaintiffs' claims fall within the discretionary function exception to the Federal Tort Claims Act. The claims are barred by sovereign immunity, and the Court lacks subject matter jurisdiction. Thus, the Government's motion is granted.

## I.  Procedural History

Plaintiffs Carl Anderson, Marshall Anderson, Elmer C. Anderson, Inc., Jeff Wiersma, and J2 Cattle, Co. filed the above-captioned case against Defendants the United States of America, U.S. Army, and U.S. Department of Defense on January 25, 2018. ECF No. 1. Defendants filed an Answer to the Complaint on March 22, 2018, ECF No. 10, and a Motion to Dismiss for Lack of Jurisdiction against the U.S. Army and U.S. Department of Defense on May 16, 2018, ECF No. 13. They also filed a Motion to Dismiss for Lack of Jurisdiction over Plaintiffs' inverse condemnation and strict liability claims. ECF No. 16.

Plaintiffs filed a First Amended Complaint on June 26, 2018. ECF No. 21. The following day, Defendants filed a Motion to Dismiss for Lack of Jurisdiction

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** *2

over five of the six remaining claims in the amended complaint. ECF No. 22. Defendants filed an Answer to the First Amended Complaint on July 10, 2018. ECF No. 24. They also submitted the present Motion to Dismiss for Lack of Jurisdiction based on the discretionary function exception on September 18, 2018, ECF No. 39.

Plaintiffs filed a Second Amended Complaint ("SAC") on June 26, 2018, which terminated the U.S. Army and U.S. Department of Defense as defendants, added Nick Martinez and S. Martinez Livestock, Inc. as Plaintiffs, and removed the causes of action for inverse condemnation and strict liability. ECF No. 99. The amendment thus mooted Defendant's initial Motions to Dismiss, ECF Nos. 13, 16.

On May 21, 2019, the Court granted the Defendant's Motion to Dismiss for Lack of Jurisdiction based on the discretionary function exception. ECF No. 111. Plaintiffs appealed the Order, and the Ninth Circuit reversed and remanded on October 20, 2020. ECF Nos. 121, 127. On December 17, 2020, the parties were granted leave to conduct additional discovery and an evidentiary hearing was set. ECF No. 128.

Plaintiffs filed a Motion in Limine regarding the evidentiary hearing on February 18, 2022. ECF No. 135. The parties submitted exhibit lists and trial briefs in anticipation of the same. ECF Nos. 138, 139, 142, 145. The evidentiary hearing was held on March 21 and 22, 2022 in Spokane, Washington. ECF Nos. 149, 151. The parties filed post-hearing briefs in April of 2022. ECF Nos. 154, 155.

## II. Factual Background

This case arises from a brush fire, referred to herein as the "Range 12 Fire," which ignited at the Yakima Training Center on July 30, 2016. The Range 12 Fire started when a U.S. Army soldier fired a machine gun at a target using tracer rounds during a live fire training. One of the tracer rounds ricocheted off the steel target area and landed on some brush, which started the fire. The Range 12 Fire spread beyond the YTC and onto Plaintiffs' rangeland properties, causing property

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS *3**

damage to Plaintiffs' cattle businesses. Plaintiffs seek damages caused by alleged negligent, tortious, and/or reckless acts of one or more of the U.S. Army soldiers who started the fire during live weapons firing.

At the evidentiary hearing on March 21 and 22, 2022, the Court heard testimony from the former Yakima Training Center Base Commander, Lieutenant Colonel Jarett D. Mathews, and Yakima Training Center Senior Range Officer, George D. Holman.[1] The Court finds both witnesses to be credible. The following factual findings derive from the evidence presented at the hearing and the parties' respective statements of material facts.

The Yakima Training Center ("YTC") presents a 500-mile training and firing range in southeastern Washington State, west of the well-known Hanford Nuclear Reservation. It is the largest military land space in Washington State. The YTC is associated with the U.S. Joint (Military) Base Lewis–McChord ("JBLM"), which is located south of Tacoma in western Washington. The YTC's primary mission is to serve as an active military training area for JBLM Army troops and other visiting units, which is estimated at between 10,000 and 40,000 troops at any given time. YTC provides the opportunity to train in live fire training, maneuver, and combined arms exercises to prepare American and allied soldiers for combat. The principal structure at YTC is the Range Control Office, Building 1805 ("Range Control"), which is a few miles into YTC and south-centrally located. Relevant to this matter, Range 12 is just one small piece of YTC. Range 12 is located eight to ten miles away from Range Control.

The YTC's landscape is mostly shrub-steppe, making it one of the largest remaining shrub-steppe habitats in Washington. Modest hills and valleys dominate the terrain, and the YTC has three distinct parallel ridges running east to west.

---

[1] This Order utilizes Lt. Col. Mathews' and Officer Holman's ranks at the time of the Range 12 Fire.

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS *4**

These elevated areas are part of the western perimeter of the Columbia River Plateau. Given the YTC's military training and live fire purpose, its steppe-shrub brush terrain and high desert climate, it is susceptible to experiencing hundreds of fires each year, principally man-made, but some natural or of unexplained origin. Soldier personnel who are trained in brushfire suppression before training reportedly suppress 80% of these fires.

In addition to fire awareness and brushfire suppression, each Army training unit is required to perform a Risk Assessment of their proposed training activities. During the wildland fire season (April 15th through September 30th), for example, and among many other things, YTC utilizes a Live Fire Risk Matrix. The Fire Matrix uses a fire weather adjective rating, along with wind readings, that produces a numerical point value. The numeric point value determines the decision approval authority to approve or authorize training during the wildland fire season. For example, the Fire Matrix considers a red flag warning an elevated risk. The National Oceanic and Atmospheric Administration provides that red flag conditions exist when wind speeds are maintained at 15 miles per hour at least 20 feet off the ground for several hours. The Risk Assessment ensures that everyone who is involved in training activities contemplates fire risk factors.

Lieutenant Colonel Jarret D. Mathews was the YTC Garrison Commander in July 2016. As Garrison Commander, Lt. Col. Mathews was the senior military officer at YTC and responsible for all operations at the installation.

Senior Range Officer George D. Holman was a civilian employee with decades of experience in range control and management in July 2016. As a Senior Range Officer, he was responsible for managing the YTC's range/training complex and supervising the range division. He maintained responsibility for the timing, coordination, and safety of combined arms firing exercises. Officer Holman also planned, directed, scheduled, and managed all range training activities; this role

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS *5**

included developing solutions to range problems and recommending changes to superiors.

## A. July 29, 2016: Day Prior to the Range 12 Fire

A number of units were training at YTC on Friday, July 29, 2016—the day before the Range 12 Fire—including the Company Bravo, 5th Battalion, 20th Infantry (the "Army training unit"). The Army training unit was performing a multitude of training exercises in preparation for a deployment.

Lt. Col. Mathews spent July 29th at JBLM, while Officer Holman was present at the YTC installation. Officer Holman spoke with Lt. Col. Mathews by phone in the evening and reported that several fires had ignited during training. Officer Holman paused training and contacted Lt. Col. Mathews to reassess conditions; this procedure is referred to as a tactical pause or safety stand-down. Officer Holman testified that three small fires ignited on July 29th, which turned into one large fire and required all assets and firefighters to extinguish. As noted, it is not considered abnormal to have fires on the range while training during summer months. Weapon systems can cause fires depending on what is fired and what they have impacted, including vehicles like tanks.

Due to these fires, Lt. Col. Mathews and Officer Holman discussed the status of the fire department and the need to refit and refresh the force. Officer Holman suggested that training suspend for the night, and Lt. Col. Mathews agreed to a pause of training to allow the fire department to refit. Lt. Col. Mathews and Officer Holman agreed that they would reassess the next morning to ascertain the weather conditions and status of the firefighters and fire resources. Since training stopped prematurely, a serious incident report was submitted to higher commands, as the missed time was reportable.

## B. July 30, 2016: Day of the Range 12 Fire

The morning of Saturday, July 30, 2016, Lt. Col. Mathews remained at JBLM and was preparing to return to the YTC. Lt. Col. Mathews pulled decision-

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS \*6**

making authority for live fire training to his level, notwithstanding the number determination on the Fire Matrix.

Before 7:00 a.m. that day, Lt. Col. Mathews spoke with Officer Holman on the phone to discuss the tactical pause that occurred the night before. They discussed the inability to draw—that is, to receive from a warehouse—non-tracer ball ammunition for training that day. While all ammunition can cause fires, Lt. Col. Mathews and Officer Holman thought using this type of ammunition would reduce the fire risk, as tracer ball ammunition is generally understood to have a higher hazard for fire.

The inability to draw the non-tracer ball ammunition was due to the Logistics Readiness Call ("LRC"). The LRC was a warehouse under the authority of the installation commander, which at the time was an adjacent and supporting organization outside of Lt. Col. Mathews' command and control. Officer Holman contacted LRC to inquire about non-tracer ball ammunition, but civilian staff were unavailable that Saturday—typically their day off—to facilitate the draw. Thus, the failure to acquire the non-tracer ball ammunition was due to the inability to contact the right leaders on their day off in a timely manner.

Accordingly, Lt. Col. Mathews and Officer Holman discussed additional mitigation to reduce fire risks if training proceeded. Lt. Col. Mathews testified that if training was further delayed for the Army training unit on July 30th, it could have impacted the unit's deployment date downrange. As a result, Lt. Col. Mathews testified that reassessment in the morning of July 30th required considerations of risk mitigation to minimize impacts to the Army training unit's deployability. They agreed to place two extra fire resources on Range 12. While moving the additional resources to Range 12 was not required by standard operating procedures, Lt. Col. Mathews believed their presence on Range 12 would reduce travel time in case of a fire, improve assessment by having trained

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** *7

firefighters on site, and generally mitigate fire risk by having more resources to apply to a fire.

Lt. Col. Mathews intended to set two additional restrictions on live fire training to mitigate the fire risk. First, Lt. Col. Mathews and Officer Holman discussed a tactical pause if a number of small fires occurred. Lt. Col. Mathews did not specify a specific number of fires that should trigger ceasefire; he testified that, rather than articulating a specific number, he relayed his general intent to Officer Holman. Lt. Col. Mathews stated that his intent was that a number of smaller fires would not turn into a larger fire, like the events of July 29th. He testified that he left some discretion to Officer Holman to determine what small number of fires warranted a tactical pause and reassessment, but Lt. Col. Mathews did not intend for a single fire to warrant a pause of training.

Second, they discussed a tactical pause if wind speeds at Range 12 reached red flag conditions. On July 30th, a red flag warning existed for the entire region of eastern Washington and eastern Oregon, beginning at 1300 hours. However, it was not a guarantee that red flags conditions would land on Range 12 during the training period. For this reason, Lt. Col. Mathews stated that his intent was that training would continue so long as red flags conditions did not materialize locally on Range 12. In their discussion, Lt. Col. Mathews and Officer Holman used red flag terminology and Lt. Col. Mathews did not articulate a specific wind speed. While Lt. Col. Mathews believed at the time that Range 12 had a capability of monitoring the winds locally with accuracy to make real-time decisions, he later learned that there were just a few places on the installation that could measure such data—and Range 12 was not one of them. Wind speed could be measured at Range Control, which was eight to ten miles away from Range 12. In July 2016, there was no requirement for units to employ ground-based wind detection in order to provide real time wind speed-readings while training.

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS *8**

In establishing the additional restrictions, Lt. Col. Mathews considered that there was a significant reduction of fuel available. In this context, fuel refers to grass or safe fuels for fire. Since there were many fires earlier in the year, Lt. Col. Mathews understood that there was a significant reduction in fuels on Range 12 to start fires.

At the conclusion of his conversation with Officer Holman, Lt. Col. Mathews did not formally request a brief-back from Officer Holman. Lt. Col. Mathews' understanding of the limitations he dictated to Officer Holman on the day of the fire changed when he realized that Officer Holman did not have the same understanding of the restrictions. Lt. Col. Mathews chalked up the discrepancies to his failure to effectively communicate his desires to Officer Holman.

Officer Holman remembers his interactions with Lt. Col. Mathews slightly different, and specifically, he only recalls one restriction. First, Officer Holman testified that he did not remember Lt. Col. Mathews instructing that a small number of fires on the range was a trigger for a tactical pause. Officer Holman was aware of each fire that occurred due to hourly, or even more frequent, reporting by Range Control. He clarified that if Lt. Col. Mathews had told him to stop unit training if *any* fire occurred on July 30th, he would have done so after the first fire.

Second, Officer Holman fully understood Lt. Col. Mathews' restriction that training should cease if red flag conditions materialized on Range 12. He testified that it was already standard operating procedure to ceasefire if red flag conditions are recorded. On July 30th, Officer Holman informed Range Control that, if the winds reached red flag conditions, they were to immediately notify him. Officer Holman never received any report on July 30th indicating that winds on Range 12 reached red flag conditions.

At 12:24 p.m. on July 30th, Officer Holman called Lt. Col. Mathews and provided an update about the training conditions. As the standard operating

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS *9**

procedures did not require reporting for every fire, Officer Holman did not report each fire to Lt. Col. Mathews, although several had occurred that morning. At the time of the phone call, Lt. Col. Mathews was driving to YTC from JBLM. Officer Holman reported that training was going well, and wind speeds had not reached red flag conditions. They agreed that training could continue. Officer Holman did not provide Lt. Col. Mathews updates on any fires that morning, and Lt. Col. Mathews did not specifically ask about fires. At the time, Lt. Col. Mathews believed no fires had occurred in the morning.

The next time Officer Holman contacted Lt. Col. Mathews was at 4:45 p.m., after the Range 12 Fire began. Personnel and firefighting assets were unable to get the fire under control before it crested the hill, went over the top and down the southeast side, and left the post's southern boundary. While the fire on the installation was extinguished on August 1, 2016, the Range 12 Fire continued to rage south of the installation in the Yakima Valley for several days. Plaintiffs use a portion of acreage southeast of the post for their cattle business operations. Approximately 153,000 acres burned, which included federal, state, and private property, including Plaintiffs'.

### C. Army Regulation 15-6 Investigation

Colonel Robert Kuth undertook an Army Regulation 15-6 investigation ("AR 15-6 Investigation") of the Range 12 Fire on September 8, 2016. ECF No. 33-1 at 4–18. Lt. Col. Mathews provided a written statement in which he discussed the two restrictions he established for training on July 30th. Lt. Col. Mathews indicated in his written statement, and during his testimony, that he believed the Army training unit did not violate any established range procedures and were following their training plan. However, at the time of the report, Lt. Col. Mathews stated that he did not believe the Army training unit adhered to his additional specific restrictions on July 30th to pause training once they encountered a number of small range fires. He testified that this understanding was based in part on his

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS \*10**

belief that his communications made it down to the unit training; however, they did not.

### III.    Legal Standard

#### A. <u>Subject Matter Jurisdiction</u>

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Under Federal Rule of Civil Procedure 12(b)(1) and (h)(3), a district court must dismiss an action where it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1), (h)(3). "Absent a waiver of sovereign immunity, courts have no subject matter jurisdiction over cases against the [federal] government." *Munns v. Kerry*, 782 F.3d 402, 412 (9th Cir. 2015) (citing *Kaiser v. Blue Cross of Cal.*, 347 F.3d 1107, 1117 (9th Cir. 2003)). "[A]ny waiver 'must be unequivocally expressed in statutory text . . . and will not be implied.'" *Ordonez v. United States*, 680 F.3d 1135, 1138 (9th Cir. 2012) (omission in original) (quoting *Lane v. Pena*, 518 U.S. 187, 192 (1996)).

An attack on subject matter jurisdiction may be either facial or factual. *Edison v. United States*, 822 F.3d 510, 517 (9th Cir. 2016). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

In this case, the Government mounted a factual attack when it filed affidavits and exhibits challenging Plaintiffs' allegations that would otherwise invoke jurisdiction under the Federal Tort Claims Act. *See Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004). Generally, in response to a factual attack, a plaintiff "must present 'affidavits or any other evidence necessary to satisfy [their] burden of establishing that the court, in fact, possesses subject matter jurisdiction." *Edison*,

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** *11

822 F.3d at 517 (quoting *Colwell v. Dep't of Health & Human Servs.*, 558 F.3d 1112, 1121 (9th Cir. 2009) (citation omitted)).

"Unless the jurisdictional issue is inextricable from the merits of a case, the court may determine jurisdiction on a motion to dismiss for lack of jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure." *Kingman Reef Atoll Invs., L.L.C. v. United States*, 541 F.3d 1189, 1195 (9th Cir. 2008); *Robinson v. United States*, 586 F.3d 683, 685 (9th Cir. 2009). A district court may "hear evidence regarding jurisdiction" and "resolv[e] factual disputes where necessary." *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983). "[N]o presumptive truthfulness attaches to plaintiff's allegations." *Id.* (internal quotation marks omitted). When examining a factual attack under Rule 12(b)(1), then, "the court can actually weigh evidence to confirm the existence of the factual predicates for subject-matter jurisdiction." *Global Tech., Inc. v. Yubei (XinXiang) Power Steering System Co. Ltd.*, 807 F.3d 806, 810 (6th Cir. 2015) (quoting *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 440 (6th Cir. 2012)).[2] The Court does not presume that the plaintiff's factual allegations are true. *Russell v. Lundergan–Grimes*, 784 F.3d 1037, 1045 (6th Cir. 2015).

However, the Court must treat the motion to dismiss as a motion for summary judgment if "'the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits' of an action." *Sun Valley Gasoline, Inc. v. Ernst Enters., Inc.*, 711 F.2d 138, 139 (9th Cir. 1983) (quoting *Augustine* at 1077). Normally, the issue of jurisdiction and the merits of an action are intertwined

---

[2] The Ninth Circuit has not further delineated a district court's role in resolving jurisdictional factual disputes on a Rule 12(b)(1) motion. Absent additional guidance from the Ninth Circuit, the Court finds the Sixth Circuit's rationale and findings persuasive on this issue.

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS *12**

where "a statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiff's substantive claim for relief." *Safe Air*, 373 F.3d at 1039 (citing *Sun Valley*, 711 F.2d at 139). In such a case, the district court must treat a Rule 12(b)(1) motion to dismiss for lack of jurisdiction as a summary judgment motion under Rule 56. *See id.*

## B. Federal Tort Claims Act

The Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 171 *et seq.*, provides a limited waiver of the sovereign immunity of the United States for torts committed by federal employees acting within the scope of their employment. 28 U.S.C. § 1346(b)(1); *Gonzalez v. United States*, 814 F.3d 1022, 1026–27 (9th Cir. 2016). FTCA's waiver of immunity is limited by a number of statutory exceptions. *See* 28 U.S.C. § 2680. This case deals with the discretionary function exception ("DFE").

The DFE provides that the FTCA shall not apply to

> [a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

*Id.* § 2680(a). The DFE is designed to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984). Where the DFE applies, the United States has not waived its sovereign immunity and the Court lacks subject matter jurisdiction over the plaintiffs' claims. *Gonzalez*, 814 F.3d at 1027 (citing *GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1173 (9th Cir. 2002)). It is the government's burden to demonstrate the applicability of the DFE. *Gonzalez*, 814 F.3d at 1027; *Marlys Bear Medicine v. United States ex rel. Sec. of the Dep't of the Interior*, 241 F.3d 1208, 1213 (9th Cir. 2001).

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** *13

In determining whether the DFE bars a claim, district courts apply the two-part test set forth in *United States v. Gaubert*, 499 U.S. 315 (1991), and *Berkovitz v. United States*, 486 U.S. 531 (1988). Under that test, the DFE applies if (1) the act or omission on which the claim is based "involves an element of judgment or choice"; and (2) "that judgment is of the kind that the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 536; *see also Gaubert*, 499 U.S. at 322–23. Both elements are discussed in detail below.

## IV.    Discussion

Plaintiffs bring causes of action for common law negligence, trespass, and nuisance, and a violation of Wash. Rev. Code § 76.04.730. *See* ECF No. 99 at 9–16. The present jurisdictional issue is whether the Government's challenged conduct involved an element of judgment or choice that implements social, economic, or political policy considerations. *Nurse v. United States*, 226 F.3d 996, 1000–01 (9th Cir. 2000) (citing *Berkovitz*, 486 U.S. at 536).

As a threshold matter, the Court must determine the standard of review. FTCA is not "a statute [that] provides the basis for both the subject matter jurisdiction of the federal court and the plaintiff's substantive claim for relief," and therefore, the issue of jurisdiction and the merits of the action are not intertwined. *Safe Air*, 373 F.3d at 1039 (citing *Sun Valley*, 711 F.2d at 139). Although the answer to the jurisdictional question is probative of Plaintiffs' claims, such as the negligence cause of action, the Court finds it is neither dispositive nor inextricable from the merits of the case. Since the jurisdictional issue is distinct from the merits of the action, the Court must consider the Government's motion under the regular standard for motion to dismiss for lack of jurisdiction, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. *See Kingman Reef*, 541 F.3d at 1195; *Sun Valley*, 711 F.2d at 139. Further, as Plaintiffs bring a factual attack under Rule 12(b)(1), the Court must resolve the factual disputes, and Plaintiffs' factual

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS \*14**

allegations are not presumed to be true. *Augustine*, 704 F.2d at 1077; *Russell*, 784 F.3d at 1045.

The Court next considers the admissibility of certain evidence submitted by the parties. The Ninth Circuit remanded the Court's previous dismissal due to significant factual disputes. It directed the Court as follows:

> We note that Commander Mathews described his order as 'specific' in the first statement he gave to Colonel Kuth during the administrative investigation after the fire. Discrepancies in the witness statements also raise questions regarding the weather and conditions updates Commander Mathews received on the day of the fire. Because the record contains significant inconsistencies between the statements given by the most critical witnesses, plaintiffs are entitled to an opportunity to cross-examine Commander Mathews, SRO Holman, and Colonel Kuth. An evidentiary hearing will likely be required to resolve the issues presented by the government's motion. On remand, we leave it to the district court to determine whether depositions of Commander Mathews, SRO Holman, Colonel Kuth, or a government witness under Fed. R. Civ. P. 30(b)(6) would be helpful to prepare for an evidentiary hearing.

ECF No. 121 at 4. In accordance with the Ninth Circuit's remand order, the Court granted Plaintiffs leave to take depositions as needed. ECF No. 129. The discovery deadline was extended to permit the same. ECF No. 131. Plaintiffs were also given an opportunity to cross examine the aforementioned witnesses at the evidentiary hearing.

At the hearing, the parties agreed the testimony of Col. Kuth was not necessary; Plaintiffs waived their right to call him as a witness and suggested submitting post-hearing supplemental briefs instead of further examination. ECF Nos. 152 at 199–202. The Court accepted the recommendation. The Government concurred with the request but moved the Court to admit Col. Kuth's AR 15-6 investigation report as part of the record, arguing it was admissible under Federal Rule of Evidence 803(A)(i) and (iii). *Id.* at 200; ECF No. 137 at 10. Plaintiffs objected to its admission in full on the basis it was unreliable. ECF No. 135 at 2.

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** *15

The Court determines it does not need to consider the AR 15-6 Investigation report to resolve the Government's motion, as most of the report is not relevant. The Court considers only select portions of the report that were used by Plaintiffs during cross-examination at the hearing. These portions are reliable and admissible under Rule 803. *See* Fed. R. Evid. 803(A)(i), (iii).

Plaintiffs also moved to exclude other broad categories of evidence, such as documents produced after witness depositions and any Government witness testimony that a purported act was performed because it was customary. The Court took these matters under advisement pending a determination of whether such evidence would be presented. ECF No. 152 at 17–20. None of the issues were raised during the hearing, and therefore, the motion to exclude is now dismissed as moot.

There is a final issue of the factual scope of Plaintiff's allegations and the Government's Motion to Dismiss. Although many of Plaintiffs' arguments at the hearing exceeded the factual allegations in Plaintiffs' SAC, the Court nonetheless considers the merits of these arguments.

## A. Whether the Challenged Conduct Involved an Element of Judgment or Choice.

As the "discretionary function" name reflects, the first element of the DFE is whether the challenged conduct involves an element of discretion, judgment, or choice. *Gaubert*, 499 U.S. at 322. The act is not discretionary when a "'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive.'" *Id.* (quoting *Bekovitz*, 486 U.S. at 536)). Similarly, if the particular option chosen by the employee is "specifically proscribed by applicable law," then the "discretionary function exception does not apply." *Broidy Cap. Mgmt., LLC v. State of Qatar*, 982 F.3d 582, 591 (9th Cir. 2020); *see also Nurse*, 226 F.3d at 1002

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** *16

("In general, governmental conduct cannot be discretionary if it violates a legal mandate.").

Plaintiffs point to three mandatory directives they contend should have prevented the Range 12 Fire. They claim (1) Officer Holman failed to adhere to Lt. Col. Mathews' oral orders imposing two additional training restrictions on the day of the Range 12 Fire; (2) Lt. Col. Mathews and Officer Holman failed to adequately communicate with and provide adequate information, supervision, and/or training to its personnel, employees, and/or agents who were carrying out training exercises on the day of the Range 12 Fire; and (3) civilian personnel failed to exchange tracer ammunition with non-tracer ammunition, which increased the fire risk. *See, e.g.*, ECF No. 99 (Second Amended Complaint) at 5–9.

The Government argues that Army personnel did not violate a specific and mandatory directive on the day of the Range 12 Fire. Specifically, the Government asserts Lt. Col. Mathews and Officer Holman had discretion regarding the manner and method of fire prevention, and whether to allow the Army training unit to engage in live fire training exercises on July 30th, given the weather conditions and resources available. The Government further asserts that, even if mandatory directives existed, Plaintiffs have not demonstrated they were violated.

### 1. Lt. Col. Mathews' Additional Restrictions

Plaintiffs present two arguments regarding Lt. Col. Mathews' oral restrictions to Officer Holman on July 30th. First, Plaintiffs argue that Officer Holman violated a directive from Lt. Col. Mathews to ceasefire and consult with Lt. Col. Mathews if a small number of fires ignited on Range 12. It is undisputed that the Army training unit encountered more than one fire during training in the morning, and Officer Holman did not report the multiple fires to Lt. Col. Mathews.

The record evidence demonstrates Lt. Col. Mathews did not issue a clear and specific directive to Officer Holman that would have removed his discretion to continue live fire training. Lt. Col. Mathews' order to Officer Holman was neither

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** *17

1   clear nor specific to create a mandatory directive under the DFE. *See Gaubert*, 499
2   U.S. at 322; *Berkovitz*, 486 U.S. at 536 ("[T]he discretionary function exception
3   will not apply when a federal statute, regulation, or policy *specifically* prescribes a
4   course of action for an employee to follow.") (emphasis added). As opposed to a
5   strict numerical limit of fires, Lt. Col. Mathews testified that he sought to
6   communicate his general intent to Officer Holman. There is no dispute that Lt. Col.
7   Mathews did not request Officer Holman to report each fire to him. Lt. Col.
8   Mathews' and Officer Holman's testimony indicated that Lt. Col. Mathews
9   requested Officer Holman to ceasefire and reassess after a "small number" of fires.
10  Lt. Col. Mathews testified that his order left discretion to Officer Holman to
11  determine, in his professional judgment and experience as a Senior Range Officer,
12  what number of fires warranted a tactical pause. His command to Officer Holman
13  was not specific, but rather, required some amount of discretion on the number of
14  fires that warranted a tactical pause, including reporting to and reassessment with
15  Lt. Col. Mathews. As Officer Holman's compliance with the order required an
16  element of "judgment or choice," it was a discretionary function on his part.
17  *Berkovitz*, 486 U.S. at 536.

18          Second, Plaintiffs contend that Officer Holman failed to comply with Lt.
19  Col. Mathews' directive that required a tactical pause if wind speeds reached red
20  flag levels. It is undisputed that standard operating procedures required ceasefire if
21  winds reached red flag levels, and also, Lt. Col. Mathews expressly dictated a
22  restriction to ceasefire if red flag conditions materialized on Range 12.

23          Relevant to this restriction, Plaintiffs argue they need only articulate a
24  mandatory rule that could be applicable to the situation, not that the mandatory rule
25  was violated on July 30th. The Court disagrees. If Plaintiffs did not have to proffer
26  at least a scintilla of evidence that a pertinent directive was violated in the conduct
27  challenged, Plaintiffs could endlessly prolong litigation by pointing to general
28  military policies to withstand summary judgment on jurisdiction, even where there

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** *18

is no dispute of material fact. Federal courts are courts of limited jurisdiction, and they "possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *Kokkonen*, 511 U.S. at 377 (internal citations omitted). In this case, Plaintiffs had an opportunity to perform all jurisdictional discovery requested. The Court held an evidentiary hearing to resolve the parties' purported factual discrepancies regarding the events on July 30th. ECF Nos. 149, 151. Plaintiffs have not alleged, much more demonstrated, that additional discovery would alter resolution of the jurisdictional issue. *See, e.g.*, *Esquivel v. United States*, 21 F.4th 565, 578 (9th Cir. 2021) (affirming a district court's denial for additional jurisdictional discovery on the basis that the requested discovery would not "make a difference to the jurisdictional analysis"). For those reasons, the Court concludes that at this late stage in the proceedings, Plaintiffs must proffer at least some evidence to indicate the Government violated an alleged directive on July 30th. *Accord Elder v. United States*, 312 F.3d 1172, 1177 (10th Cir. 2002) (stating that plaintiffs must show that the defendant actually violated a specific and mandatory federal statute, regulation, policy, or other directive).

That being the case, the Court turns to the merits of Plaintiffs' argument. The parties agree that there is no universal definition of red flag conditions. Plaintiffs claim red flag conditions are defined as wind speeds of 10 miles per hour or greater; however, they do not proffer any evidence to support this definition. The record evidence defines red flag conditions as winds sustained for several hours that are greater than 15 miles per hour and at least 20 feet off the ground. Plfs' Exh. 50; *see also* ECF No. 33-1 at 197; ECF No. 92-1 at 13. On this point, Plaintiffs cite to both the standard operating procedures and Lt. Col. Mathews' express delineations on July 30th to argue mandatory directives were violated.

In the AR 14-6 Investigation report and in Lt. Col. Mathews' testimony, Lt. Col. Mathews stated his instructions regarding wind speeds were specific to conditions recorded at Range 12, not Range Control. Officer Holman's assessment

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS *19**

of red flag conditions on July 30th involved a matter of judgment when considering the resources available on Range 12. While Lt. Col. Mathews believed at the time that wind speeds could be measured with accuracy on Range 12, the Government lacked an ability to measure wind speeds in real-time at that location. Consequently, it appears that whether wind speeds were sustained for several hours at 15 miles per hour and at least 20 feet off the ground *on Range 12* involved some level of judgment from Officer Holman and the Army training unit.

More crucially, Plaintiffs have failed to demonstrate Officer Holman or another Government employee actually violated the restriction. Again, Lt. Col. Mathews did not order Officer Holman to ceasefire due to the region-wide red flag warning or red flag conditions *at Range Control*, where wind speeds could be measured. On July 30th, Range Control did not alert Officer Holman that wind speeds on Range 12 reached red flag levels. Further, the record evidence demonstrates that wind speeds on Range 12 did not reach sustained red flag conditions until after the fire started at 4:49 p.m. and headed to the hilltop above Range 12. ECF No. 153 at 30–32. Assuming for the sake of argument that the standard operating procedure and Lt. Col. Mathews' order established a specific and mandatory order that removed Officer Holman's discretion despite the limited conditions on the ground, the Government did not violate that directive.

Relatedly, Plaintiffs state that Officer Holman's failure to inform Lt. Col. Mathews of every fire or increasing wind speeds violated a specific directive from Lt. Col. Mathews. However, they fail to provide any evidence that Lt. Col. Mathews ordered more frequent updates on either the quantity of fires or the wind speeds on Range 12.

Given this, the Court finds that Lt. Col. Mathews' additional training restrictions on July 30th involved an element of judgment or choice. The evidence presented also indicates that the additional restrictions, as characterized by Plaintiffs, were not violated on July 30th.

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** *20

2.  <u>Failure to Communicate</u>

Next, Plaintiffs argue that Lt. Col. Mathews and Officer Holman's failure to effectively communicate the additional restrictions violated a mandatory Army policy. Lt. Col. Mathews admitted that there appeared to have been a "breakdown" in communication between him and Officer Holman on July 30th, and his intended restrictions were not precisely understood; Lt. Col. Mathews "chalked it up to [his] failure to effectively communicate" his desires for training. ECF No. 152 at 54, 61–62. Further, Officer Holman testified that if Lt. Col. Mathews had given him instructions for additional restrictions on unit training, it would have been his duty to clearly communicate those controls to Range Control. *Id.* at 190.

Plaintiffs cite to a Risk Management pamphlet produced by the U.S. Department of the Army. *See* Plfs' Exh. 35 (Army Pamphlet 385-30). The pamphlet states as follows: "Once the commander or supervisor has identified the hazards and selected controls, the controls must be effectively implemented and documented. . . . Army commanders and staff must ensure controls are integrated, communicated, and understood at all levels." *Id.* at 20. It further provides that "[t]he most important aspect of implementing controls is clearly communicating how the controls will be put into effect, who will implement them, how they fit into the overall operation, and how the commander expects them to be enforced." *Id.*

Plaintiffs' argument that the pamphlet creates a specific and mandatory policy to communicate effectively fails for two reasons. First, it is not clear that Lt. Col. Mathews failed to communicate effectively with Officer Holman, despite Lt. Col. Mathews believing he did not adequately relay his intentions after the fact. As Lt. Col. Mathews testified to, the intended restrictions were not specific controls that wholly eliminated Officer Holman's discretion to continue live fire training on July 30th. The pamphlet states controls must be clearly communicated in a way that "the commander expects them to be enforced." *Id.* It is not evident the

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** *21

pamphlet applies to Lt. Col. Mathews' communications with Officer Holman on July 30th, given that his stated intentions were not to set a specific control for the number of fires that would have eliminated Officer Holman's discretion; and similarly, as noted above, the practical limitations at Range 12 regarding wind speeds and weather conditions necessitated Officer Holman's judgment on whether to continue live fire training. The record does not indicate the guideline itself, whether mandatory or not, was violated.

Second, the pamphlet is not a binding policy or regulation and would not have materially influenced the Government's decisions in terms of the training, fire risks, and live fire at YTC on July 30th. On this point, Plaintiffs emphasize the apparent mandatory language in the pamphlet: "Army commanders and staff *must* ensure controls are integrated, communicated, and understood at all levels." *Id.* at 20 (emphasis added). However, the language must be analyzed in its overall context, and in this case, the "mandatory-sounding language such as 'shall' does not overcome the discretionary character" of the pamphlet broadly, much more the Government's ultimate decision to continue live fire training on July 30th. *See Lam v. United States*, 979 F.3d 665, 677 (9th Cir. 2020). The express purpose of the pamphlet's framework is to "allow[] Army leaders to operate with maximum initiative, flexibility, and adaptability." Plfs' Exh. 35 at 8. The pamphlet states that "Army operations . . . are demanding and complex," and "[m]anaging risks related to such operations requires educated judgment, situational knowledge, demonstrated experience, and professional competence." *Id.*

In this case, "the presence of a few, isolated provisions cast in mandatory language does not transform an otherwise suggestive set of guidelines into binding agency regulations." *See Sabow v. United States*, 93 F.3d 1445, 1453 (9th Cir. 1996). To interpret the pamphlet as establishing an enforceable mandate on the clarity of communications would frustrate the purpose of the pamphlet and the Army leaders' ability to "operate with maximum initiative, flexibility, and

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS \*22**

adaptability." *Id.* Rather, the pamphlet's flexible framework reaffirms the discretionary nature of the Government's decisions on July 30th, given the totality of the circumstances.

### 3. Tracer Ammunition

As a last-ditch argument, Plaintiffs contend that the on-call status of the civilian employees at the LRC should have prevented the Army training unit's use of tracer ball ammunition before the fire, as Army personnel "are obligated to respond to calls and to come into work." ECF No. 154 at 8:11–12.

Plaintiffs do not cite to any rule or policy that suggests the civilian Army personnel at the LRC were obligated to respond to calls and draw ammunition on July 30th. In their post-hearing brief, Plaintiffs cite to a portion of the transcript that concerns Officer Holman's personal work requirements as a Senior Range Officer. Officer Holman testified he was "on-call" when units were firing and was required to come into work "*if* [he was] able to," or otherwise designate another employee to go in his stead. ECF No. 152 at 156–157 (emphasis added). In this case, Officer Holman's obligations as the Senior Range Officer at YTC are inapposite to the requirements of the LRC Armory employees. Plaintiffs' failure to cite to any Army or ammunition supply policy on this issue is fatal to their claim.

Nonetheless, the Court finds the merits of Plaintiffs' argument unavailing. Whether LRC employees should have been on-call is irrelevant to the conduct challenged in this action. It is undisputed that use of tracer ammunition at YTC *was* permitted, and the ultimate decision to use tracer ammunition on July 30th required judgment from Lt. Col. Mathews and Officer Holman. Even if LRC Armory employees should have been available on July 30th, the use of tracer ammunition was the kind of discretionary decision contemplated by the Army fire safety guidelines.

//
//

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** *23

### B. Whether the Challenged Conduct Involved Social, Economic, or Political Policy Considerations.

If a specific course of action is not specified, the court must "determine 'whether that judgment is of the kind that the discretionary function exception was designed to shield.'" *Sabow* 93 F.3d at 1451 (quoting *Gaubert*, 499 U.S. at 322–23); *Myers v. United States*, 652 F.3d 1021, 1028 (9th Cir. 2011). "[I]f the judgment involves considerations of social, economic, or political policy, the exception applies." *Id.* (cleaned up). "When a statute or regulation allows a federal agent to act with discretion, there is a 'strong presumption' that the authorized act is based on an underlying policy decision." *Nurse* 226 F.3d at 1001 (quoting *Gaubert*, 499 U.S. at 324).

Government actions can be classified along a spectrum, ranging from those "totally divorced from the sphere of policy analysis," such as driving a car, to those "fully grounded in regulatory policy," such as the regulation and oversight of a bank. *O'Toole v. United States*, 295 F.3d 1029, 1035 (9th Cir. 2002) (citing *Gaubert*, 499 U.S. at 325 n.7, 332–34, for these examples); *Whisnant v. United States*, 400 F.3d 1177, 1181 (9th Cir. 2005). The relevant inquiry is not whether the explicit balancing is proved, but whether the decision is susceptible to policy analysis. *Kennewick Irr. Dist. v. United States*, 880 F.2d 1018, 1028 (9th Cir. 1989).

It is evident that the challenged conduct in this action was based on policy considerations that the DFE was intended to shield. Notably, Plaintiffs do not argue in their latest briefing that the second prong of the DFE analysis is not satisfied. Nor can they.

The Government's decision to continue live fire training on July 30th did not involve failure to implement safety precautions that existed under a specific and mandatory established policy. In contrast, the decision necessitated the balancing of competing policy considerations that were envisioned by the fire safety

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS *24**

guidelines. *Whisnant*, 400 F.3d at 1182 (distinguishing adoption of safety precautions based on policy considerations and implementation of the same); *Marlys Bear Medicine*, 241 F.3d at 1215–16 ("The decision to adopt safety precautions may be based on policy considerations, but the implementation of those precautions is not."); *see also ARA Leisure Servs. v. United States*, 831 F.2d 193, 195 (9th Cir. 1987). As the Court already established above, Plaintiffs have not cited a mandatory directive or order regarding fire safety the Government failed to adhere to on July 30th.

Lt. Col. Mathews testified that training elements, such as the frequency of training and type of ammunition used, required balancing of numerous factors. He testified that the need to train troops, and ensure Army readiness and national defense, were some of the elements that weighed into his decision to continue training on July 30th with the fire mitigations implemented. For example, Lt. Col. Mathews explained that further delay of the Army training unit's training could have impacted their deployability down the line, which also could have affected Army readiness. The factors weighed by Lt. Col. Mathews parallel those required of Officer Holman when he considered what conditions on the ground warranted a tactical pause and reevaluation on July 30th. Absent a more specific directive, Officer Holman was forced to weigh fire risks on one hand with the unit's immediate need for training on the other.

Having to weigh the need to train the unit on one hand, with risk of fire during the summer months on the other, is the precise kind of decision that is grounded in professional military discretion and is due a district court's highest deference. Here, Lt. Col. Mathews and Officer Holman believed that fire risks were adequately mitigated due to the additional fire resources on Range 12 and the amount of fuel available. Absent breach of a mandatory and specific directive, such professional decisions regarding military training are clearly subject to policy analysis and are shielded from tort liability. *See, e.g.*, *Wood v. United States*, 845

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS \*25**

F.3d 123, 131 (4th Cir. 2017) ("Military operation decisions are the kind of government policy choices the discretionary function was designed to shield."). The rationale for the DFE is plainly applicable to this case, as imposing tort liability would lead to judicial second-guessing of Army policy decisions, and the threat of tort liability could become a tool to shape Army operations or policy. *See id.*

The Government has demonstrated that the conduct challenged in this action is at least "susceptible to policy analysis," *Kennewick*, 880 F.2d at 1028, given the "strong presumption" that a discretionary act is based on a policy decision, *Nurse*, 226 F.3d at 1001. And given the particular facts of this case, the Government has demonstrated Lt. Col. Mathews and Officer Holman explicitly balanced these policy considerations to continue training on July 30th.

## V.    Conclusion

Due to the foregoing, the Court finds the Government has satisfied its burden of proving Plaintiffs' claims fall outside of the jurisdictional scope of the Federal Tort Claims Act. The conduct Plaintiffs challenge involved military judgment that was grounded in public policy, which is shielded by the discretionary function exception. 28 U.S.C. § 2680(a). As such, Plaintiffs' action is barred by federal sovereign immunity, and the action is dismissed for lack of subject matter jurisdiction. *Munns*, 782 F.3d at 412; *Gonzalez*, 814 F.3d at 1027.

//
//
//
//
//
//
//
//

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** *26

Accordingly, **IT IS HEREBY ORDERED**:

1.      Plaintiffs' Motion in Limine, ECF No. 135, is **DENIED**.

2.      Defendant's Motion to Dismiss Under FTCA's Discretionary Function Exception, ECF No. 39, is **GRANTED**.

3.      Plaintiffs' Second Amended Complaint is **DISMISSED with prejudice**.

4.      Judgment shall be entered in favor of Defendant and against Plaintiffs.

**IT IS SO ORDERED**. The District Court Clerk is hereby directed to enter this Order, provide copies to counsel, **and** close the file.

**DATED** this 10th day of June 2022.



Stanley A. Bastian
Chief United States District Judge

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** *27